# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

### Case No. 1:19-cv-02727

| | |
|---|---|
| ALDER CRUZ | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| DEPARTMENT OF HOMELAND | ) |
| SECURITY; and Kevin McAleenan, | ) |
| Acting Commissioner, U.S. Customs and | ) |
| Border Protection, in his official capacity; U.S. | ) |
| Customs and Border Protection; Matthew | ) |
| Albence, Acting Director, U.S. Immigration and | ) |
| Customs Enforcement, in his official capacity; | ) |
| U.S. Immigration and Customs Enforcement, | ) |
| | ) |
| *Defendants.* / | |

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## INTRODUCTION

1.      This case challenges the government's new policy of forcing asylum seekers to
return to Mexico while they await their removal proceedings, in violation of the
Immigration and Nationality Act (INA), the Due Process and Equal Protection Clauses of
the U.S. Constitution, the Administrative Procedures Act (APA), and protections to
which they are entitled under U.S. and international law.

2.      Plaintiff is an asylum seeker from Guatemala who is in danger in Mexico
because he was forcibly expelled there from the U.S. under the new policy.

3.      Since the enactment of the 1980 Refugee Act, U.S. law has prohibited the return
of individuals to countries where they are likely to face persecution, while providing an
asylum procedure by which individuals fleeing persecution can seek safety. Beginning in
January, the government eviscerated these protections, simply forcing asylum seekers out
of the U.S. with no due process of any kind, in direct violation of U.S. law.

4.      Under the new policy, authorities are forcing asylum seekers at the southern
border of the United States to return to Mexico, where they must remain for the duration
of their asylum proceedings. Defendants have given the new policy the Orwellian name
"Migrant Protection Protocols" ("MPP"). It was first announced by Secretary of
Homeland Security Kirstjen Nielsen on December 20, 2018, and implemented at the San
Ysidro Port of Entry in California on January 28, 2019. Defendants have since then
expanded use of the policy to over 10,000 asylum seekers.

5.      The new policy violates the INA because the authority cited by Defendants, INA
§ 235(b)(2)(C), 8 U.S.C. § 1225(b)(2)(C)—a provision that allows the return pending
removal proceedings of certain noncitizens who arrive by land from a contiguous foreign

territory—cannot, by its clear language, be used against the asylum seekers to whom Defendants are applying it. It also violates INA § 208, 8 U.S.C. §1158 (establishing a right to apply for asylum), and INA § 241(b)(3),8 U.S.C. § 1231(b)(3) (prohibiting removal to a country where one would face persecution).

6.      The policy violates the Due Process Clause of the U.S. Constitution because the Plaintiff was in the U.S. when he was detained by Defendants. His Notice To Appear states he is "an alien present in the United States," not "an arriving alien." He was held for 26 days before he was forcibly expelled from the U.S. with no process whatsoever. 7.

7.      The policy violates the Equal Protection Clause because it is motivated by invidious discrimination and is not narrowly tailored to achieve a compelling government interest.

8.      The policy violates the APA, because the policy is arbitrary, capricious, and contrary to law and because Defendants failed to comply with the APA's notice and comment requirements. The process Defendants have implemented for determining who can be returned under the policy is wholly flawed for ensuring that those who face persecution, torture, or death in Mexico will not be erroneously returned. It is completely unlike any previously used to adjudicate claims for protection. By placing them in danger, and under conditions that make if difficult if not impossible for them to prepare their cases, Defendants are depriving them of an opportunity to seek asylum in violation of the law.

## JURISDICTION & VENUE

9.      This case arises under the Fifth Amendment Due Process Clause of the U.S.

Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.; the

Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing

regulations; and the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform

and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, §

2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), the

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Alien Tort Statute, 28

U.S.C. § 1350.

11.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies

of the United States and officers of the United States acting in their official capacity and

reside in the District. The policy and memorandums challenged in this action originated

and were issued in this district.


## PARTIES

12.      Plaintiff Alder Cruz fled Guatemala to seek asylum in the United States on May

3, 2019. He was apprehended on May 10 and held in the custody of the Department of

Homeland Security (DHS) at several detention centers until June 6, 2019, when he was

forcibly sent to Mexico pursuant to Defendants' new policy. He is currently in the border

town of Nava, Coahuila state, where he fears for his life.

13.     Defendant U.S. Department of Homeland Security is a cabinet-level department

of the U.S. government. Its components include U.S. Citizenship and Immigration

Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S.

Immigration and Customs Enforcement ("ICE").

14.     Defendant Kevin McAleenan is the Acting Commissioner of CBP. He is sued in

his official capacity.

15.     Defendant CBP is the sub-agency of DHS that is responsible for the initial

processing and detention of noncitizens who are apprehended at or between U.S. ports of

entry.

16.     Defendant Matthew Albence is the Acting Director of ICE. He is sued in

his official capacity.

17.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out

removal orders and overseeing immigration detention.


## BACKGROUND

18.      Asylum seekers who arrive at the southern border seeking protection in the

United States are fleeing some of the most dangerous countries in the world, El Salvador,

Guatemala, and Honduras. The levels of violence in this region are comparable to those

typically seen in war zones. The majority of the migrants coming to the southern border

have legitimate claims to asylum.

19.     Plaintiff is a Guatemalan citizen who sought asylum in the United States because

he experienced death threats and the recent murder of his best friend. He was targeted by

a criminal gang because his sister Efigenia is the leader of a church group which helps

children escape from a life of crime with the Mara gangs.

20,    Plaintiff and most asylum seekers from Central American travel by land to the United States due to documentation requirements that would be necessary to board a plane, as well as financial constraints. Although this means they must cross through Mexico before reaching the United States, for most, remaining in Mexico is not an option. Asylum seekers in Mexico face a heightened risk of kidnapping, disappearance, trafficking, sexual assault, forced return to their homelands and murder, among other harms.

21.    Plaintiff filed a similar lawsuit in South Florida District Court on July 5, 2019. Plaintiff filed a Motion for Temporary Restraining Order or Preliminary Injunction on July 21, 2019 which was not ruled on or set for a hearing. As an exhibit Plaintiff filed the Notice to Appear issued in his case, which has checked that he was present in the U.S. at the time of his arrest by CBP. Defendants then filed as an exhibit the same Notice to Appear, which was identical to the Plaintiff's copy except that the checkmark showing that Plaintiff was present in the U.S. at the time of his arrest appears to have been whited out. Defendants' NTA was sealed by the District Court on July 31, 2019 on Defendants' motion. Defendants filed a Motion for Change of Venue on July 26, 2019 arguing that venue was not proper in the Southern District of Florida and a hearing was set for August 20, 2019. Plaintiff filed a Notice of Voluntary Dismissal on August 3, 2019 and the case was dismissed without prejudice on August 29, 2019.

**PRIOR PROCEDURES AT THE U.S.-MEXICO BORDER**

22.     Until the new policy, individuals applying for asylum at the southern border were divided into two categories. They were either: 1) placed in expedited removal proceedings under INA §235(b)(1), 8 U.S.C. §1225(b)(1), or 2) placed in full removal proceedings under INA §240, 8 U.S.C. §1229a. Expedited removal allows for the immediate removal of noncitizens who lack valid entry documents or attempt to enter the U.S. through fraud—unless they express a fear of removal. *See* 8 U.S.C. § 1225(b)(1)(A)(i). Plaintiff and the vast majority of asylum seekers arrived in the U.S. without valid entry documents and were thus subject to expedited removal proceedings, not regular removal proceedings.

23.     Those who were placed in expedited removal needed to pass a credible fear interview with an asylum officer first. Once they passed this interview by showing a "significant possibility" that they could establish eligibility for asylum - a low threshold - they were placed in regular removal proceedings in the United States, 8 U.S.C. §1225(b)(1)(B)(v).

24.     Regardless whether they were placed in expedited removal or regular removal proceedings, prior to Defendants' new policy, asylum seekers went through proceedings inside the United States. Those who were not placed in expedited removal were simply placed in regular removal proceedings without going through the credible fear process. Both categories of asylum seekers could either be held in detention or released pursuant to parole or bond pending completion of their asylum proceedings. Whether detained or released, however, no asylum seeker could be physically removed from the United States without an order of removal duly issued by either an immigration judge in full removal proceedings or,

for those asylum seekers who failed to pass a credible fear screening, by an immigration
adjudicator in expedited removal proceedings.

## THE NEW FORCED TO MEXICO POLICY

25.     On December 20, 2018, DHS Secretary Nielsen announced an "unprecedented"
change to the existing policy. In what DHS described as an "historic action to confront
illegal immigration," Defendant Nielsen announced a new policy, dubbed the "Migrant
Protection Protocols" ("MPP"), under which DHS would begin requiring noncitizens
who seek admission from Mexico "illegally or without proper documentation" to be
"returned to Mexico for the duration of their immigration proceedings."

26.     According to DHS, the new policy would address the problem of noncitizens
who allegedly "game the system" and "disappear into the United States," and deter
migrants from making "false" asylum claims at the border.  Subsequently, in a press
release justifying the new policy, DHS cited "misguided court decisions and outdated
laws [that] have made it easier for illegal aliens to enter and remain in the U.S.,"
especially "adults who arrive with children, unaccompanied alien children, or
individuals who fraudulently claim asylum." DHS stated that the new policy "will
discourage individuals from attempting illegal entry and making false claims to stay in
the U.S."

27.     During the first two weeks the policy was in place at San Ysidro, the asylum
seekers forced to return to Mexico were all single adults. On February 13, 2019, asylum-
seeking families were returned to Mexico, one of which included a one-year old child.
On February 11, 2019, the forced return policy was expanded to the Eagle Pass Port of

Entry in Texas, and thereafter throughout Texas, which is where Plaintiff was apprehended and expelled from the U.S. on June 6.

### DEFENDANTS PURPORTED LEGAL AUTHORITY DOES NOT APPLY TO PLAINTIFF ON ITS FACE

28.     Defendants claim that authority for their new forced return policy comes from 8 U.S.C. § 1225(b)(2)(C). This section authorizes DHS to "return" certain individuals who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States" to that contiguous territory during the pendency of their removal proceedings.

29.     However, 8 U.S.C. § 1225(b)(2)(C) **cannot by its clear language be used against the asylum seekers to whom Defendants are applying it. This is because the provision relied on by the Defendants is in the section for regular removal  § 1225(b)(2), not the section for expedited removal  § 1225(b)(1).**

30.     Almost all of the asylum seekers at the southern border lack valid entry documents and are therefore described and included section of the law for expedited removal. Defendant is correct that it is well established that the government has discretion to place individuals amenable to expedited removal in full removal proceedings. **Nonetheless, regardless of how the government chooses to process them, Plaintiff and other asylum seekers who arrived in the U.S. without documents remain part of the category described in section 1225(b)(1). They are still subject to expedited removal and the procedures described in 8 U.S.C. § 1225(b)(1), not those described in 8 U.S.C. § 1225(b)(2), and therefore not subject to 8 U.S.C. § 1225(b)(2)(C).** As

9

one commentator stated, "a cat remains a cat even if the city chooses to put it in a shelter

for dogs."

31.     Defendants state that their forced return policy does not apply to anyone who

was "processed for expedited removal." CBP, MPP Guiding Principles, at (dated Jan. 28,

2019). **However, whether or not the Defendants choose to process an individual for**

**expedited removal is irrelevant. The population that is expressly targeted by the**

**policy, asylum seekers who cross the border illegally or who present themselves for**

**admission at a port of entry without proper documents, is precisely the population**

**to whom the expedited removal statute applies, whether or not the government**

**chooses to process them for expedited removal**.

32.     **In addition, and critically important, 8 U.S.C. § 1225(b)(2)(B)(ii). specifically**

**exempts from the coverage of 1225(b) those individuals to whom the expedited**

**removal statute allegedly applies.**


**THE U.S. CONSTITUTION GUARANTEE OF DUE PROCESS WAS
VIOLATED WHEN PLAINTIFF WAS THROWN OUT OF THE US
WITH NO PROCESS WHATSOEVER**

33.     The MPP blatantly violates Plaintiff's most basic rights under the Due Process

Clause of the Fifth Amendment of the U.S. Constitution. Plaintiff had already entered the

U.S. when he was apprehended, and he had been incarcerated in the United States for 26

days prior to his forced removal to Mexico. He is thus undoubtedly entitled to the

protections of the U.S. Constitution.

**34.     As the Supreme Court stated clearly in 1953:  "[A]liens who have once passed**

**through our gates, even illegally, may be expelled only after proceedings conforming**

to traditional standards of fairness encompassed in due process of law", *Shaughnessy v. Mezei*, 345 U.S. 206, 212 (1953) (citing a 114 year old case *The Japanese Immigrant Case,* __189 U. S. 86__, __189 U. S. 100__-101 (1903)).

35.     The Due Process Clause forbids the government to "deprive any **person [not U.S. citizen]…** of liberty… without due process of law." Plaintiff was expelled from the U.S. without any hearing or interview of any kind, *Plaintiff's affidavit*. It is abundantly clear to any high school civics student that what happened to Plaintiff is not any process at all. Exactly the contours of what process the Plaintiff is due may be debated. However it is very clear that the U.S. Constitution does not allow for people to be simply be forced out of the country by armed police without any process whatsoever, as happened in this case and as authorized by the MPP.

36.     "**Once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary or permanent,**" *Zadvydas v. Davis,* 533 U.S. 678 (2001), See Plyler v. Doe, 457 U. S. 202, 210 (1982); Mathews v. Diaz, 426 U. S. 67, 77 (1976); Kwong Hai Chew v. Colding, 344 U. S. 590, 596–598, and n. 5 (1953); Yick Wo v. Hopkins, 118 U. S. 356, 369 (1886); cf. "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," *Zadvydas,* supra.

37.     The courts must, of course, uphold constitutional rights in immigration cases. "Nor do cases holding that, because Congress has plenary power to create immigration law, the Judicial Branch must defer to Executive and Legislative Branch decision making in that area help the Government, because that power is subject to constitutional limits,"

*id*. "Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority," *Bridges*, supra, (MURPHY, J. concurring).

38.     If Congress had spoken clearly to authorize the MPP there would be a stronger case for Defendant. However, like Zadvydas, this is not the case here. Instead, the executive is relying on a single sentence in a statue which facially does not apply to Petitioner. "Despite this constitutional problem, [if]… Congress has made its intent… clear, we must give effect to that intent… we cannot find here, however, any clear indication of congressional intent to grant the Attorney General the power…" *Zadvydas, supra.*

39.     In addition to not giving the respondent any hearing (process) whatsoever before expelling him from the U.S., Petitioner was subjected to a series of serious additional due process violations including: 1) not permitted to consult with counsel, 2) not given an interpreter and 3) the officer's decision to throw him out of the US was reviewable by a supervisory officer, but no other appeal or review by a judge was available.

40.     A right to appeal is fundamental to due process: "Moreover, the sole procedural protections available to the alien are found in administrative proceedings..., without… significant later judicial review… This Court has suggested, however, that the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights," *Zadvydas*, supra. See also *Superintendent, Mass. Correctional Institution at Walpole v. Hill*, 472 U. S. 445, 450

(1985) (O'CONNOR, J.); see also *Crowell*, 285 U. S., at 87 (Brandeis, J., dissenting) ("[U]nder certain circumstances, the constitutional requirement of due process is a requirement of judicial process")."

41.     The violation of liberty here is very severe and may well lead to the death of Petitioner and others who are subject to the MPP: "Here the liberty of an individual is at stake… we are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty-at times a most serious one-cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness," *Bridges v. Wixon*, 326 U.S. 135, 147 (1945).  Deportation may result in "the loss of all that makes life worth living," *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). "The serious constitutional problem arising out of a statute that… permits a… deprivation of human liberty without any such protection is obvious," *Zadvydus*, supra. See also, Peter L. Markowitz, Straddling the Civil-Criminal Divide: A Bifurcated Approach to Understanding the Nature of Immigration Removal Proceedings, 43 HARV. C.R.-C.L. L. REV. 289, 295, 338, 346 (2008) (discussing the serious deprivation of liberty that accompanies deportation).

42.     The Constitution demands greater procedural protection even for property. See *South Carolina v. Regan*, 465 U. S. 367, 393 (1984) (O'CONNOR, J., concurring in judgment); *Phillips v. Commissi*oner, 283 U. S. 589, 595–597 (1931) (Brandeis, J.). "Only by zealously guarding the rights of the most humble, the most unorthodox and the

most despised among us can freedom flourish and endure in our land," *Bridges,*

*(MURPHY, J. concurring),* supra*.*

## THE NEW POLICY IS MOTIVATED BY INVIDIOUS DISCRIMINATION AND VIOLATES THE EQUAL PROTECTION CLAUSE

43.     The new policy is not based on a change in circumstances, but rather motivated

by invidious discrimination and racial bias. President Trump has frequently described the

motives underlying the new policy. On January 11, 2018 President Trump grew frustrated

with lawmakers in the Oval Office when they discussed protecting immigrants from

Haiti, El Salvador and African countries as part of a bipartisan immigration deal. "Why

are we having all these people from shithole countries come here?" Trump said. Trump

then suggested that the United States should instead bring more people from countries

such as Norway. The president, according to a White House official, also suggested he

would be open to more immigrants from Asian countries because he felt that they help

the United States economically. In addition, the president singled out Haiti, telling

lawmakers that immigrants from that country must be left out of any deal. "Why do we

need more Haitians?" Trump said, according to people familiar with the meeting. "Take

them out."

44.     On February 24, 2015, President Trump demanded that Mexico "stop sending

criminals over our border."  On March 5, 2015, he tweeted that he "want[ed] nothing to

do with Mexico other than to build an impenetrable WALL . . . ." On June 16, 2015,

during his speech launching his presidential campaign, President Trump characterized

Mexican immigrants as criminals, "rapists," and "people that have lots of problems."

President Trump later asserted that these remarks were "100 percent correct." Three days

later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?"

45.     On August 6, 2015, during the first Republican presidential debate, President Trump said "they send the bad ones over because they don't want to pay for them, they don't want to take care of them." On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.  At the police station, they stated "Donald Trump was right; all these illegals need to be deported."  When asked about the incident, President Trump failed to condemn the men, instead saying, "I will say that people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate."

46.     On August 31, 2016, President Trump raised concerns about immigrants, saying "we have no idea who these people are, where they come from.  I always say Trojan Horse." In August 2017, President Trump asserted that a group of white supremacists marching in Charlottesville, Virginia included "some very fine people."  Former Massachusetts Republican Governor Mitt Romney suggested that these comments "caused racists to rejoice," while Republican Senator Lindsay Graham noted that the President was "now receiving praise from some of the most racist and hate-filled individuals and groups in our country." Former Ku Klux Klan leader David Duke thanked President Trump for his "honesty and courage."

47.     On August 22, 2017, during a rally in Phoenix, Arizona, President Trump described unauthorized immigrants as "animals" who bring "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking." On August 25, 2017, President Trump

pardoned former Maricopa County Sheriff Joseph Arpaio, who had been convicted of criminal contempt by United States District Judge Susan R. Bolton for intentionally disobeying a federal court order to cease targeting Latinos. A comprehensive investigation by the United States Department of Justice found that under Sheriff Arpaio's leadership the Maricopa County Sheriff's Office engaged in a pattern and practice of unconstitutional conduct and violations of federal law based on its blatantly discriminatory practices against Latinos. In pardoning Sheriff Arpaio, President Trump praised him as an "American patriot" and suggested that he was "convicted for doing his job."

48.     In May and June 2016, President Trump repeatedly attacked United States District Judge Gonzalo Curiel, asserting that because he was "of Mexican heritage" he had "an absolute" and "inherent conflict of interest" that precluded him from hearing a lawsuit against President Trump's eponymous university. Republican Speaker of the House Paul Ryan characterized President Trump's comments as "the textbook definition of a racist comment."

49. Due to this discriminatory motive the new policy must be narrowly tailored to achieve a compelling government interest, an extremely high burden which cannot be met here, see, e.g. *Adarand Constructors v. Peña*, 515 U.S. 200 (1995).


**BY FORCING PLAINTIFF TO MEXICO WITHOUT PROCEDURES FOR DETERMINING WHETHER HE WILL FACE PERSECUTION OR TORTURE THERE OR ENABLING HIM TO MEANINGFULLY ACCESS THE ASYLUM PROCESS FROM MEXICO, THE NEW PROCEDURE VIOLATES THE APA, THE INA AND INTERNATIONAL LAW OF *NONREFOULMENT***

50.     The "MPP Guiding Principles" give CBP officers discretion whether to subject

migrants to forced return under the policy, or instead to process them under regular

removal proceedings or expedited removal proceedings. In making this decision,

however, officers are not to consider whether the individual could be gravely harmed in

ways that may amount to persecution or torture or whether the individual has a legal

status in Mexico for the duration of removal proceedings or a place to reside.

51.     The Guiding Principles do require that Defendants consider whether an

individual is  "more likely than not" to face persecution or torture if returned to Mexico—

the standard required to obtain "withholding of removal" and one of the few exceptions

to the forced return policy. However, on January 28, 2019, USCIS issued guidance setting

forth the procedure for making this determination. *See USCIS Policy Guidance, PM-602-*

*0169, Guidance for Implementing Section 235(b)(2)(C) of the Immigration and*

*Nationality Act and the Migrant Protection Protocols, dated Jan. 28, 2019 ("USCIS*

*Guidance").* The procedure established for making this determination lacks almost any

safeguards.

52.     To receive a determination under the procedure, an asylum seeker must, without

any notice, advice or opportunity by the officer, affirmatively state a fear of persecution in

Mexico. Then the individual must establish before an officer that they are entitled to

withholding or CAT protection on the merits—i.e., that it is more likely than not they will

be persecuted or tortured. The asylum seeker is not permitted to consult with counsel

either before or after the interview. In addition, there is no guarantee of an interpreter to

assist at the interview. The asylum officer's determination is reviewed by a supervisory

asylum officer but no other appeal or review by a judge is available. Moreover, if while

in Mexico the individual suffers actual persecution or torture, or other changed circumstances arise that might affect the determination, there is no opportunity to revisit a negative determination, until the individual returns to the port of entry for their scheduled removal hearing.

53.     These procedures are a stark departure from procedures the Executive Branch has adopted to implement its duty towards asylum seekers set forth in the INA of *nonrefoulement*. In regular removal proceedings, for example, the decision whether an individual faces persecution or torture is made in a hearing before an immigration judge, with a right to counsel, present evidence, and cross-examine witnesses, and then with a right to seek administrative and judicial review.

54.     Plaintiff was never asked about fear of return to Mexico, and was simply directed to sign forms he did not understand and that were not explained to him. "I had no other alternative, now that [signing the forced removal] wasn't a request, but it was an order," *Plaintiff's affidavit.* Plaintiffs' experience demonstrates that asylum seekers are not being referred to asylum officers despite their real fears of return to Mexico. Instead, Defendants are simply sending asylum seekers to Mexico without asking them anything or giving them any opportunity to request any relief.

55.     The U.S. Department of State acknowledges that "violence against migrants by government officers and organized criminal groups" is one of "the most significant human rights issues" in Mexico. The State Department also reports that the dangers that forced many Central American migrants to flee their homes are likewise present in Mexico, as the presence of Central American gangs has "spread farther into the country and threatened migrants who had fled the same gangs in their home countries."

56.     The conditions in Mexico will make it difficult if not impossible for Plaintiff and other asylum seekers to meaningfully exercise their right to apply for asylum. Asylum seekers who are attacked, kidnapped, or killed in Mexico will be wholly unable to pursue their asylum applications. For those who escape violence but nonetheless live in fear of harm, the psychological strains of navigating danger, necessary limitations on their movement to avoid violence, lack of a secure place to live, and other challenges will prevent them from being able to devote the time needed to meaningfully prepare for their asylum proceedings—a process that, under normal conditions, can require hundreds of hours. These pressures may deter even those with the strongest asylum claims to give up, rather than endure the wait under such conditions.

57.     Even if he is not subject to violence or forced to return to Guatemala, Plaintiff will be unable to properly prepare his case from Mexico, access or meaningfully communicate with attorneys, and access expert or other professional services necessary to make out his asylum claim. The grave danger and insecurity he faces in Mexico will undermine his ability to prepare for his case and meaningfully access the asylum system.

58.     Plaintiff has a sister and other family members in Miami who would help support him and pay an immigration attorney in the U.S. In Mexico, however, he does not have anyone to help him with the legal process or financial resources to support himself for months or years. He worries that, without assistance, he will not be able to gather evidence or prove his case.

59.     Even President Trump acknowledged that Mexico is not a safe place, tweeting on January 31, 2019: "Very sadly, murder cases in Mexico in 2018 rose 33% from 2017, to 33,341." He stated that the situation in Mexico is "Worse even than Afghanistan."

60.     The border regions where asylum seekers subjected to Defendants' new policy will be returned are especially dangerous. Tijuana, the city where migrants returned from the San Ysidro port of entry are being dumped, is one of the deadliest cities in the world. Tijuana had its highest number of reported murders ever last year, and Baja California, the state in which Tijuana is located, was the state in Mexico with the highest number of reported murders last year. Asylum seekers in Tijuana have been the direct targets of violence. Two teenagers from Honduras were kidnapped and murdered in Tijuana last December.

61.     Similar dangers face asylum seekers like Plaintiff forced to return from the Eagle Pass Port of Entry and dumped in Coahuila state. The U.S. Department of State advises that Americans reconsider travel to Coahuila because violent crime and gang activity are common, and U.S. employees traveling in Piedras Negras, the town across from Eagle Pass, must observe a nighttime curfew.

62.     In addition to fearing violence in Mexico, Plaintiff fears that Mexico will deport him to Guatemala where he will be murdered. There is no functioning asylum system in Mexico, and Central American asylum seekers face a substantial risk of being involuntarily repatriated to the countries they have fled. Intergovernmental and human rights organizations have documented widespread instances of Mexican officials returning Central American migrants to their home countries despite their fears of persecution or torture, without any meaningful process. The U.S. Department of State's 2017 Human Rights Report on Mexico notes "incidents in which immigration agents had been known to threaten and abuse migrants to force them to accept voluntary deportation and discourage them from seeking asylum."

63.     President Trump recently advocated for Mexico to deport individuals who

arrived on "caravans," regardless of their claims for asylum and other protection:

"Mexico should move the flag waving Migrants, many of whom are stone cold criminals,

back to their countries. Do it by plane, do it by bus, do it anyway (sic) you want, but they

are NOT coming into the U.S.A. We will close the Border permanently if need be."


### THE MPP WAS ADOPTED WITHOUT NOTICE-AND-COMMENT RULEMAKING

64.     The foregoing allegations are repeated and realleged as if fully set forth herein.

65.     Although the new procedure effects a radical change in the treatment of asylum

seekers to the U.S., Defendants adopted it without undertaking notice-and-comment

rulemaking.  The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies

conduct rulemaking before engaging in action that impacts substantive rights. DHS is an

"agency" under the APA, and the MPP and the actions that DHS has taken to implement

it are "rules" under the APA, See 5 U.S.C. § 551(1), (4). With exceptions that are not

applicable here, agency rules must go through notice and- comment rulemaking, See 5

U.S.C. § 553. A proposed regulation, "Return to Territory," appeared on a list of

anticipated rulemaking in the fall of 2017, spring of 2017, and fall of 2018, but was

withdrawn on December 21, 2018.


### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(VIOLATION OF INA § 235(b)(2)(C), 8 U.S.C. § 1225(b)(2)(C), TREATMENT OF ALIENS ARRIVING FROM FOREIGN CONTIGUOUS TERRITORY, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))**

66.     8 U.S.C. § 1225(b)(2)(C) permits the return to a contiguous territory only of an "alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States." This section does not refer to Plaintiff or others who arrived at the U.S. border without documents, who are described in the prior section 1225(b)(1). To make it even more clear, 1225(b)(2)(B) further provides that the return authorized in Section 1225(b)(2)(C) shall not be applied to any noncitizen "to whom paragraph (1) [Section 1225(b)(1) expedited removal] applies." 8 U.S.C. § 1225(b)(2)(B)(ii).

67.     Defendants are applying their policy of sending asylum seekers to Mexico to individuals, including the Plaintiff, who cannot lawfully be returned under Section 1225(b)(2)(C).

68.     As a result, the forced return policy is contrary to law. *See* 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**

**(VIOLATION OF THE U.S. CONSTITUTION DUE PROCESS CLAUSE)**

69.     The foregoing allegations are repeated and realleged as if fully set forth herein.

70.     The MPP violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution because Plaintiff had already entered the U.S. when he was detained and had been incarcerated in the United States for 26 days prior to his forced removal to Mexico. He was thus subject to and protected by the U.S. Constitution. He could not simply be forced out of the country **without any process whatsoever**. "Once an alien enters the

country, the legal circumstance changes, for the Due Process Clause applies to all persons

within the United States, including aliens, whether their presence is lawful, unlawful,

temporary or permanent," *Zadvydas v. Davis,* 533 U.S. 678 (2001). "To hold that the

political branches may switch the Constitution on or off at will would lead to a regime in

which they, not this Court, say 'what the law is,'" *Boumediene v Bush,* 553 U.S. 723

(2008).


### THIRD CLAIM FOR RELIEF

### (VIOLATION OF THE EQUAL PROTECTION CLAUSE
### OF THE U.S. CONSTITUTION)

71.     The foregoing allegations are repeated and realleged as if fully set forth herein.

72.     The Fifth Amendment forbids federal officials from acting with a discriminatory

intent or purpose, See *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *Bolling v.*

*Sharpe*, 347 U.S. 497, 500 (1954).

73.     To succeed on an equal protection claim, plaintiff must show that the defendants

"discriminated against them as members of an identifiable class and that the

discrimination was intentional," *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130,

1134 (9th Cir. 2003).  "Determining whether invidious discriminatory purpose was a

motivating factor demands a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available," *Vill. of Arlington Heights v. Metro. Hous. Dev.*

*Corp.,* 429 U.S. 252, 266 (1977).  "The court analyzes whether a discriminatory purpose

motivated the defendant by examining the events leading up to the challenged decision

and the legislative history behind it, the defendant's departure from normal procedures or

substantive conclusions, and the historical background of the decision and whether it

creates a disparate impact." *Avenue 6E Invs., LLC v. City of Yuma, Ariz.,* 818

F.3d 493, 504 (9th Cir. 2016).

74.     As set forth above, the MPP violates the Equal Protection Clause of the Fifth

Amendment of the U.S. Constitution because it was motivated by invidious

discrimination. As a result of this discrimination Plaintiff was forcibly ejected from the

U.S. without any hearing while similarly-situated individuals, like those who entered

through the northern border, are afforded procedural rights to and can remain in the U.S.

Due to the discriminatory motive the new policy must be narrowly tailored to achieve a

compelling government interest, an extremely high burden which cannot be met here,

see, e.g. *Adarand Constructors v. Peña,* 515 U.S. 200 (1995).


**FOURTH CLAIM FOR RELIEF**

**(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(A)) VIOLATION OF INA § 241(b)(3), 8 U.S.C. § 1231(b)(3)
WITHHOLDING OF REMOVAL, AND VIOLATION OF CUSTOMARY
INTERNATIONAL LAW: PROHIBITION ON *REFOULEMENT*)**

75.     The foregoing allegations are repeated and realleged as though fully set forth

herein.

76.     The APA provides that courts "shall . . . hold unlawful and set aside agency

action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).

77.     Defendants' forced return policy is arbitrary, capricious, and contrary to law

because they have acted against the clear language of the law, completely upended the

complex and intricate rules for asylum based on long-standing U.S. and international law without change or basis in the law, and have given no valid non-discriminatory reason for their dramatic and complete changes in policy in violation of the established law.

78.     The policy deprives asylum seekers of a meaningful right to apply for asylum contrary to Congress' clear will as expressed in the elaborate and detailed asylum procedures set forth in the INA. If Congress had intended that asylum seekers be forced out of the U.S. without any due process whatsoever or any right for their claims to be heard it would have said so clearly. Congress certainly would not have completely eviscerated U.S. asylum laws in one sentence in the roundabout way alleged by Defendants, in a statute section that is not intended for asylum seekers.

79.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). The forced return policy is contrary to law, *see* 5 U.S.C. § 706(2)(A), under 8 U.S.C.§ 1158(a)(1), because individuals are returned to conditions that meaningfully deprive them of their right to apply for asylum.

80.     The policy is arbitrary, capricious, and contrary to law because, in violation of the law, it completely departs from the agency's existing policies for determining whether individuals face a likelihood of persecution or torture, as well as all prior policies

prohibiting the return of individuals to contiguous territories pending their removal proceedings based on a fear of persecution or torture.

81.     The MPP violates the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution. Plaintiff had already entered the U.S. when he was detained, and he had been incarcerated in the United States for 26 days prior to his forced removal to Mexico, and as a result was subject to the protections of the U.S. Constitution. He could not simply be forced out of the country without any process whatsoever, as he was.

82.     By allowing an individual's forced return to Mexico unless the individual affirmatively states a fear of persecution in Mexico and establishes before an asylum officer that it is more likely than not that he or she will face persecution or torture there, the policy fails to provide basic procedural due process protections. Other basic due process rights which are violated include: any notice that he or she must affirmatively express such a fear; any opportunity to consult with counsel either prior to or during the fear interview; the guarantee of an interpreter; a written summary of the interview and written explanation of the determination; or review by a judge.

83.     The 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees, to which the United States is party, requires that the United States not "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150; *see also*

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

84.     The Refugee Convention prohibits the return of individuals to countries where they would directly face persecution on a protected ground as well as to countries that would deport them to conditions of persecution. Congress has codified these prohibitions in the "withholding of removal" provision at INA §241(b)(3), 8 U.S.C. § 1231(b)(3), which bars the removal of an individual to a country where it is more likely than not that he or she would face persecution.

85.     Pursuant to regulation, only an immigration judge can determine whether an individual faces such a risk of persecution and is entitled to withholding of removal after full removal proceedings in immigration court. 8 C.F.R. § 1208.16(a).

86.     The forced return policy provides none of these safeguards to ensure the critical protection against nonrefoulement and therefore violates Section 1231(b)(3). It permits an officer to determine whether it is more likely than not that an individual faces persecution in Mexico through a minimal procedure, without any right to review or a hearing before an immigration judge. Moreover, the procedure does not assess whether an individual is at risk of *refoulement* to his or her country of origin by Mexico, and does not account for whether an individual will be able to exercise his or her right to apply for asylum from Mexico. This procedure violates Section 1231(b)(3) and its implementing regulations. As a result, the forced return policy is contrary to law. *See* 5 U.S.C. § 706(2)(A).

87.     The prohibition on *refoulement* is a specific, universal, and obligatory norm of customary international law. That norm prohibits returning an individual to a country

where there exists a threat of subsequent forcible return to a country where the individual would be subject to torture or where the individual's life or freedom would be threatened on account of their race, religion, nationality, membership of a particular social group, or political opinion. Defendants have not undertaken a proper evaluation of the risk of *refoulement* by Mexico. The procedures for carrying out the forced return policy are inadequate to guard against such indirect *refoulement* in violation of the law of nations. Defendants were aware or reasonably should have known that indirect *refoulement* by Mexico was a foreseeable consequence of its forced return policy. Defendants knowingly and purposefully designed and, directly or through their agents, applied their forced return policy to the Plaintiff.

88.     Defendants' actions have placed the Plaintiff at risk of return to their countries of origin, where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion, or where he faces a substantial risk of torture or other cruel, inhumane, and degrading treatment. Defendants' actions have caused and will continue to cause a grave and foreseeable injury to Plaintiff, including a continued risk of *refoulement* in violation of the protections afforded to them under international law.

## FIFTH CLAIM FOR RELIEF

### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 553(b), (c), (d))

89.     The Administrative Procedure Act ("APA") requires notice and opportunity for comment prior to the promulgation of a rule. 5 U.S.C. § 553(b), (c).

90.    Defendants' nondiscretionary procedure for determining whether an individual

who is more likely than not to face persecution or torture in Mexico, and thus precluded

from being returned to Mexico during the pendency of removal proceedings, constitutes a

radical departure from prior practice and a legislative rule that requires notice-and-

comment rulemaking. Defendants did not promulgate a rule or engage in notice-and-

comment rulemaking before implementing their procedure for making fear

determinations as part of the forced return policy.

91.    The APA requires that a substantive rule be published "no less than 30 days

before its effective date." 5 U.S.C. § 553(d).

92.    Defendants failed to appropriately publish the forced return policy, its screening

procedures, and related guidance 30 days before its effective date.

93.    Plaintiff does not have an adequate damages remedy at law to address the

violations alleged herein.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays this Court to:

a.    Declare unlawful the new forced return policy (or "Migrant Protection

Protocols"), including the Secretary's January 25, 2019 Memorandum, the USCIS Policy

Guidance, and the CBP MPP Guiding Principles, Commissioner's Memorandum

Implementing the MPP, and Field Operations Memorandum Implementing the MPP; At

the least the policy is unlawful as applied to non-citizens like the Plaintiff who were in

the U.S. at the time they were apprehended by Defendants.

b.      Enter an order vacating the forced return policy and enjoining Defendants from

continuing to apply the forced return policy to third-party nationals seeking humanitarian

protection at a port of entry or between ports of entry. At the least the policy should be

enjoined as applied to non-citizens like the Plaintiff who were in the U.S. at the time they

were apprehended by Defendants.;

c.      Enter an order providing relief for the Plaintiff by ordering that Defendants return

him to the Eagle Pass Port of Entry for reprocessing of his application for admission

without subjecting him to the unlawful forced return policy;

e.      Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to

Justice Act, and any other applicable statute or regulation; and,

f.      Grant such further relief as the Honorable Court deems just, equitable, and

appropriate.


DATED:  September 11, 2019


                              Respectfully submitted,

                              /s/ Robert Sheldon, Esq.
                              ROBERT SHELDON, ESQ.
                              rsheldon@immigralaw.com
                              LAW OFFICE OF ROBERT SHELDON
                              3134 Coral Way
                              Miami, FL 33145
                              (786) 436-1714
                              FAX: (954) 973-1005
                              DC Bar # 435700
                              *Attorneys for Plaintiff Alder Cruz*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2019, I caused a PDF version of the foregoing document to be electronically transmitted to the Clerk of the Court, using the CM/ECF system for filing and mailed courtesy copies to all necessary parties using certified mail.


/s/ Robert Sheldon